**HOWARD et al. v. HOWE.**

No. 4682.

Circuit Court of Appeals, Seventh Circuit.

Sept. 23, 1932.

Rehearing Denied Dec. 2, 1932.

Horace Kent Tenney, of Chicago, Ill., Delos G. Haynes, of St. Louis, Mo., Cornelius Lynde, of Chicago, Ill., and Daniel N. Kirby, of St. Louis, Mo., for appellants.

Bruce A. Campbell, of East St. Louis, Ill., and Joseph T. Davis and Lawrence C. Kingsland, both of St. Louis, Mo., for appellee.

Before ALSCHULER and SPARKS, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Appellee, plaintiff below, a former employee of Commonwealth Steel Company of Granite City, Ill., filed his bill of complaint against Clarence H. Howard and Harry M. Pflager, individually and against them jointly with Harrison Hoblitzelle as a committee for all stockholders of the Commonwealth Company, and certain other defendants, appellants herein. In his bill appellee averred that said Howard and certain other appellants, officers of the Commonwealth Company, and the company, had by reason of alleged misrepresentations, misstatements of fact, and false promises, coupled with the confidential relationship borne by said appellants toward appellee, placed themselves in the position of trustee for the latter's use and benefit with regard to the inventions hereinafter mentioned; that appellee, influenced by the confidential position aforesaid, had implicitly relied upon the pleaded wrongful conduct of appellants and thereby been induced to transfer to said company two certain patents, viz., one for "Method of and means for forming moulds for casting," No. 995,968, issued June 20, 1911, and one for a "Sand Mill," No. 1,218,403, issued March 6, 1917; that such assignments were wholly without consideration, preceded by no agreement to execute same and induced by the fraud aforesaid; and that as a result, appellants as trustees should account to him for the use of such inventions. The bill also prayed that the committee aforesaid be restrained from disposing of the money on hand, representing the undistributed balance of the total sale price of Commonwealth Company's as-

sets to General Steel Casting Company, until an accounting should be had, and for general relief.

Appellants filed an amended answer, substantially altering their theories of defense set forth in their original answer. They contended that appellee was under agreement to make inventions such as disclosed by these patents; denied all allegations of fraud; averred that it was appellee's duty as a part of his employment to invent moulds, methods, and other improvements, which when so devised belonged to his employer; pleaded a general practice and custom, alleged to be known to appellee, for all employees to assign their inventions to the employer; averred that in pursuance thereof the employer paid bonuses and awarded prizes to its employees, including appellee; denied that appellee was entitled to any relief; and averred that he was barred from relief by laches, delay, and the statute of frauds.

The District Court found that the company, engaged in manufacturing large steel castings from 1904 to August 1, 1929, controlled and managed by Howard and Pflager (as were also its allied corporations, the patent holding companies), built up an inconsequential business into a prosperous one worth $35,000,000 and sold for that sum in 1929; that appellee was first employed by the company in 1904 as a pattern maker, and promoted thereafter successively to foreman, assistant superintendent and superintendent, remaining with the company until the sale, except for a period of some months when he was engaged in another business; that his employment was general in character, and not as an inventor; that there was no contract by him to assign any invention to the company or its nominee; that the patent first mentioned was of very important and valuable character, was the invention of appellee and contributed substantially to the success and prosperity of the employer; that Howard and his associates, by constantly cultivating and enunciating a doctrine of paternalism, co-operation, Golden Rule and good fellowship, built up a morale inspiring reliance upon them by the employees; that prizes and bonuses offered had no contractual character; that the actions of the corporate officers were such as to create a confidential relationship as contended by appellee; that appellee was the inventor also of the second patent; that Howard, occupying the confidential relationship aforesaid, procured assignments of appellee's rights to both said inventions by fraudulent misrepresentations and false promises of such character as to create a constructive trust

upon the part of the corporation, its allies and officers, for the use and benefit of appellee; that the defenses pleaded are not sustained by the proof; that appellants are entitled to shop rights in the patents; and that the appellee is entitled to an accounting. These findings are in great detail, but sufficient part thereof for determination of this appeal has been indicated.

A careful examination of a voluminous record leaves us in substantial accord with the findings of fact of the trial court as expressed in its formal findings and memorandum opinion. The oral evidence being sharply controverted in various respects, it follows that we are governed by the rule that where the trial court sees and hears the witnesses, the determination of the credibility thereof is peculiarly the function of that court unless it clearly appears from the record that such determination is erroneous. In the absence of serious mistake, apparent upon the face of the record, the findings of the trial court must be accepted by us. Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 356; Blettner v. Gill (C. C. A.) 251 F. 81; Magnetic Mfg. Co. v. Dings, etc., Co. (C. C. A.) 16 F.(2d) 739; Boyle v. Rousso, 16 F.(2d) 666 (C. C. A. 8). This rule applies with peculiar aptness to the keenly controverted question as to the relationship between appellee and his employer. Thus in Magnetic Mfg. Co. v. Dings, etc., Co. (C. C. A.) 16 F. (2d) 739, 741, we said: "We are not justified in disturbing the findings of the District Judge, who saw and heard the witnesses, and who tried the entire case with the single purpose in mind of ascertaining the exact contract relation existing between Bethke and his employer."

From the findings, it appears that appellee was under no contractual obligation to use his time in making inventions for his employer or to assign such inventions as he might conceive to the former. Appellee was regarded, prior to his inventions, at least, as only a faithful employee in the performance of his general duties in the capacities hereinbefore mentioned. In such a situation according to the Supreme Court in Dalzell et al. v. Dueber Watch-Case Mfg. Co., 149 U. S. 315, 13 S. Ct. 886, 888, 37 L. Ed. 749, the law is as follows: "But a manufacturing corporation which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained

for inventions made by him while so employed, in the absence of express agreement to that effect." To the same effect is the earlier case of Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369.

Inasmuch as the fact is that appellee was not employed to devise or perfect a mechanism or a means for accomplishing a prescribed result, and there was no express or implied agreement that any inventions he should make should belong to his employer, the case of Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 241, 68 L. Ed. 560, 32 A. L. R. 1033, is beside the point here involved. There the court's decision was based upon the existence of a contract upon the part of the employee "to devote his time to the development of a process and machinery." For this he was to receive a stated compensation. Even though it be admitted in the present case that an express contract to make inventions for the employer is not necessary, it is surely requisite that there be something in the duties of the employee that would indicate that his compensation was for labor in making the invention and that both employer and employee so understood, before it can be said that the fruits of the latter's creative labors belong to the employer. We do not believe that a finding of such situation is warranted by the present record. We find no evidence that appellee was ever employed and paid as an inventive employee. The officer who employed him testified that he was made foreman of the pattern department and as such simply had charge of pattern makers and repair and construction of patterns required for moulding; that nothing was said about employing him as an inventor or about assigning any inventions he should make.

The contention that the Sand Mill patent stands upon a footing different from that upon the moulding process is in our opinion not sustained by the record. To all intents and purposes appellee's position, at the time of the second invention, was essentially the same as at the time of the first. He had been promoted to the position of supervisor of the department and his salary increased to $250 a month, but no additional duties with regard to inventive or creative matters had been assumed by him.

Nor do we find evidence warranting a finding that there was a custom in the management of the Commonwealth Steel Company that all employees should assign their patents to the company. Indeed, it appears that while some employees in the engineering or designing departments made such assign-

ments, others transferred their patents upon the condition that the inventors should receive substantial royalties thereon.

Much is said concerning the relationship between appellee and his employer and its representatives. In view of our conclusions, it would serve no good purpose to discuss the evidence upon this subject at any great length. The oral testimony and the documentary evidence are such as to convince us that the District Court was amply justified in finding that there came into existence a confidential and fiduciary relationship upon the part of the officials of the company toward appellee, which led him to rely implicitly upon the misrepresentations and false promises of such fiduciaries. Solely as a result of the fraud practiced by them, the company obtained the grant of the title to the patents. As a result the employer and its participating officials became constructive trustees for appellee. Thus Perry, in his work upon Trusts and Trustees (7th Ed.) § 166, p. 267, says: "If one party procures the legal title to property from another by fraud or misrepresentation or concealment, or if a party makes use of some influential or confidential relation which he holds towards the owner of the legal title, to obtain such legal title from him upon more advantageous terms than he could otherwise have obtained it, equity will convert such party thus obtaining property into a trustee." See also, in this connection, Swiney v. Womack, 343 Ill. 278, 175 N. E. 419; Feeney v. Runyan, 316 Ill. 246, 147 N. E. 114; Catherwood v. Morris, 345 Ill. 617, 178 N. E. 487; Warren v. Pfeil, 346 Ill. 344, 178 N. E. 894; Constructive Trusts, 39 Cyc. p. 169; 12 R. C. L. 232, 257, 260.

Nor can it be successfully maintained that fraud may not under any circumstances be based upon the nonperformance of promises. If such promises are made to induce the fraud, if they induce one to change his status to his damage, he may seek the relief of one defrauded. It is only essential that the evidence disclose that they were fraudulent in their inception, were made in bad faith, with the intention to deceive and were the inducing cause of the detrimental change in his condition made by the complaining party in reliance thereon. 12 R. C. L. 257, 260, 261; Davids v. Davids, 333 Ill. 327, 164 N. E. 662. We believe that the doctrine stated is properly applicable to the facts here.

In this connection it should be kept in mind that appellee does not sue for breach of the promises mentioned, but rather com-

plains of them as inducing causes of such fraud as produces a constructive trust. Consequently the argument that the promises were indefinite is wholly without force. Under the evidence the promises of Howard, the chief executive officer of the employer, to take care of appellee, to treat him fairly— in other words, to keep faith with him—were apparently made, in the light of later developments, without intention to perform same, but for the purpose of inducing assignments of valuable rights without compensation.

It is asserted that appellee is barred by his own laches. Howe made the moulding form in 1910 and assigned his patent therefor the same year. Production continued from that time. But during all his employment the confidential relationship mentioned likewise continued. Appellee made his assignment upon the fraudulent inducements discussed. The promises to compensate him continued, being repeated from time to time, and were not disavowed until July 1, 1929. These repetitions prevented the tolling of the statute of limitations.

So the Supreme Court of Illinois, in Maher v. Aldrich, 205 Ill. 242, 68 N. E. 810, 815, said: "The statute of limitations will not bar a recovery, as that statute never begins to run so as to bar the recovery of a trust fund until subsequent to the disavowment of the trust by the trustee. Albretch v. Wolf, 58 Ill. 186; Hancock v. Harper, 86 Ill. 445."

In Rajah Auto Supply Co. v. Belvidere, etc., Co., 275 F. 761, 765, this court had to do with a situation similar to that now before us. There the suit for infringement was not begun until many years after plaintiff learned of the cause for complaint; but defendant had repeatedly promised to cease manufacturing. The court held appellee free of laches, saying: "Certainly appellee should be the last to complain because appellant relied upon its spoken and its written agreement."

In Van Buskirk v. Van Buskirk, 148 Ill. 9, 35 N. E. 383, 386, the Supreme Court of Illinois said: "But no certain time can be fixed within which the application for the enforcement of the trust should be made. That lapse of time which will operate as a bar must necessarily be determined by the equitable discretion of the court, and will depend upon the nature and circumstances of each case. Lapse of time will not ordinarily be regarded as a bar where there has been no adverse possession of the property by the nominal purchaser, and where he has not repudiated or disavowed the trust, but has admitted it, and

where an excuse for or explanation of the delay is furnished by the circumstances of the case or the relation of the parties." See, also, Snyder v. Snyder, 280 Ill. 467, 117 N. E. 465. Pomeroy's Equity Jurisprudence (4th Ed.) vol. 4, p. 3447, uses this language: "Where the party interposing the defense of laches has contributed to or caused the delay, he cannot take advantage of it. Likewise, a constant recognition of the right by all the parties has been held a sufficient excuse."

As appellants were in no wise prejudiced by the delay, inasmuch as appellee's action induced no change in the relative situation of the parties or appellants' financial status and caused no damage to the latter, the court will not sustain the defense of laches because of mere delay. Thus in Galliher v. Cadwell, 145 U. S. 368, 12 S. Ct. 873, 875, 36 L. Ed. 738, the court said: "laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in the condition or relations of the property or the parties." In N. P. Ry. Co. v. Boyd (C. C. A.) 177 F. 804, 823, the court said: "The doctrine of laches rests upon equitable principles which are neither arbitrary nor technical, and what amounts to laches depends largely upon the circumstances of each particular case. The ultimate inquiry is on which side would fall the balance of justice in sustaining or denying the defense." The same court in the same case used the following language, peculiarly pertinent to the present situation: "It is impossible to escape the conviction that the delay was not prejudicial to the appellant but was to its advantage, and that it was largely caused by its own acts." In affirming this decision the Supreme Court, in 228 U. S. 482, 33 S. Ct. 554, 562, 57 L. Ed. 931, said: "Unless the nonaction of the complainant operated to damage the defendant, or to induce it to change its position, there is no necessary estoppel arising from the mere lapse of time."

See, also, Townsend v. Vanderwerker, 160 U. S. 171, 16 S. Ct. 258, 40 L. Ed. 383; Des Moines, etc., Co. v. Des Moines Union Ry. Co., 52 F.(2d) 616 (C. C. A. 8), and Chicago, M. & St. P. Ry. Co. et al. v. Des Moines Union Ry. Co. et al., 254 U. S. 196, 41 S. Ct. 81, 90, 65 L. Ed. 219. In the last-mentioned case, the court said: "Conduct merely equivocal, or apparently inconsistent with a vigilant insistence upon the obligations of the trustee, is not sufficient to discharge a trust. The cestui que trust is entitled to rely upon

the fidelity of the trustee, until plainly put on guard against him. And the trustee is at all times disabled from making a profit for himself out of any dealings in the trust property without the express consent of the cestui que trust."

Other contentions made by appellants do not necessitate further prolonged discussion. We believe the bill sufficient to support the decree. Defendants not named in the decree may be proper parties upon an accounting. Appellants' award of shop rights is not involved in this appeal.

Finding no reversible error, the decree of the District Court is affirmed, at the cost of appellants.