Robert J. FREDRICK, Plaintiff-Respondent,

v.

BENSEN AIRCRAFT CORPORATION, Defendant-Appellant.

No. 8737.

Springfield Court of Appeals.

Missouri.

Oct. 29, 1968.

Motion for Rehearing Denied Nov. 26, 1968.

Lincoln, Haseltine, Forehand & Springer, Carl E. Yates, Edmund C. Forehand, Springfield, for defendant-appellant.

Kirby, Millsap & Lewis, John R. Lewis, Springfield, for plaintiff-respondent.

TITUS, Judge.

Plaintiff sued defendant Bensen Aircraft Corporation for actual and punitive damages, alleging defendant had falsely represented (1) plaintiff would be its exclusive franchise dealer in Greene Coun-

ty, Missouri, and (2) an amateur-built gyrocopter kit purchased by plaintiff was eligible for airworthiness certification by the Federal Aviation Agency (FAA) in accordance with Federal Aviation Regulations (FAR). At the close of plaintiff's evidence the claim anent the franchise dealership was dismissed and the trial terminated when the jury returned a verdict favorable to plaintiff in the sum of $4,200 for "actual damages." The trial court sustained defendant's motion for a new trial "on the ground that the jury verdict is excessive, unless the plaintiff remits $993.00 (Making the judgment $3207.00)," and opined, "the most favorable evidence for plaintiff proves only $4002.00 damages and the fair market value of the unboxed materials [retained by plaintiff] were not taken into account and must be said to be $795.00 in view of plaintiff's testimony * * *." Plaintiff entered the remittitur, and defendant appealed, asseverating the trial court erroneously instructed the jury and erred in not directing a verdict for it at the close of all the evidence. In attending to this latter contention, we honor the rule requiring us to review and recast the evidence in the light most favorable to the plaintiff and accept his evidence with all reasonable inference deducible therefrom as true. Gardner v. Anderson, Mo.App., 417 S.W.2d 130, 133(1).

An aside at this time may aid understanding of the contrivances involved. The gyroglider and gyrocopter resemble a helicopter except neither has a tail rotor and the single rotor atop each is not power-driven but a free-wheeling device. A gyroglider is pulled into flight attached to a towline connected to a land or water vehicle. Neither the gyroglider nor its pilot need to be certified or licensed by the FAA, and the gyroglider may be legally flown though made wholly from a "do-it-yourself" construction kit composed completely of prefabricated, pre-cut, pre-drilled components and parts and assembled "with steel bolts like an erector set." By adding an engine, a gyroglider may be converted into a gyrocopter which is a free-flying aircraft powered by a pusher-type propeller driven by a gasoline motor. Both the gyrocopter and its pilot must be certified and licensed by FAA before the craft may be lawfully flown. More will be said anon regarding rules and regulations governing gyrocopters to fit them for airworthiness certification.

Plaintiff, a rated pilot since 1962, clipped a magazine coupon and sent it to defendant together with his $3 check dated January 13, 1966. In return he received a three-dimensional drawing of a Model B-8M gyrocopter, an illustrated brochure on gyro-gliders and gyrocopters, a Bensen catalog for Winter 1966, a pamphlet concerning Bensen B-8M Gyrocopter Design Information, and a photograph of a gyrocopter in flight. On January 21, 1966, plaintiff wrote a $1,095 check to cover his order for a complete material gyrocopter kit 8M-KCAX. However, before this order was shipped, plaintiff became "excited about it * * * and I though * * * here may be a chance to get into something that might make some money, so * * * I got on the telephone and called [defendant's sales manager] to inquire * * * [if] a dealership might be available * * * [and] we established that this dealership thing might work out * * * so I subsequently asked him to cancel the original order and apply that money toward the dealer order." A $2,907 check dated February 8, 1966, was sent defendant and this, added to the $1,095 previously remitted, paid a total of $4,002 for "dealer orders one and two." At the time plaintiff placed the dealer order, the only representations made to him by defendant concerning the gyroglider and gyrocopter, and on which he relies to make a case in this matter, were as contained in the literature sent him in exchange for the coupon and $3 check. The illustrated brochure contained, inter alia, the statements, "Factory Finished Kits will get you in the air quicker!" and "The B-8M Gyrocopter can be built from Construction Plans and Kits (similar

to the above) by do-it-yourself home-builders for a fraction of the cost of the finished article. It is recommended that you first build the craft as a Gyroglider; after flying it as a Glider, you can convert it into a Gyrocopter by adding the engine." Statements of similar import are contained in the design information pamphlet.

Although plaintiff testified that when he placed his initial order he had no "knowledge concerning what it takes to fly an amateur-built aircraft," he candidly admitted, "it's relatively common knowledge that anything in free flight has to be certified * * * we know that it's a government regulation that a machine that flies in free flight, at one time or another must be licensed * * * [and it] is a fact" that before he made his purchase he knew an airworthiness certificate was required for the gyrocopter before it could be lawfully flown.

Dealer orders one and two consisted of "maybe 20" boxes of materials, 10 or 12 sets of manuals and plans, and one 90-horsepower McCullough engine. This material constituted one two-place gyroglider finished kit, one complete finished gyrocopter kit, and one complete unfinished or raw material gyrocopter kit. Upon arrival of the orders plaintiff consulted the manuals for instructions on constructing the gyroglider and gyrocopter. Plaintiff related: "It becomes obvious very early in the game when you uncrate these materials that those two manuals have nothing to do with what you are trying to do. * * * The first page tells you how to lay it out and how to drill the holes, and all this, and you open up your [prefabricated] kit and it has in there the materials that are already laid out and the holes already drilled. * * * [I looked in the manuals] far enough to realize that I had neither the knowledge nor the equipment to build anything along those lines [from the unfinished or raw materials kit.]" Thereafter, plaintiff assembled the gyroglider from the prefinished kit and suc-cessfully flew it. He then assembled the gyrocopter from the prefinished kit and requested FAA to certificate it. A general aviation maintenance inspector for FAA viewed the gyrocopter sometime during the last two weeks of April 1966, and refused certification when plaintiff told him, "Well, I just nailed together the erector set type of kit."

FAR 21.191 was stipulated to be a federal aviation regulation which "is in force and effect" and applicable to certification of amateur-built aircraft and the limitations and conditions prescribed by the Administrator for safe operation. The FAA agent who refused to certificate the gyrocopter testified, at plaintiff's call, to interpret FAR 21.191 and explain "what is required to obtain a certificate for an amateur-built aircraft under that regulation." The agent advised the jury a gyrocopter completely assembled from prefabricated components or prefabricated kits, i. e., kits which involve assembly operations only, are not eligible for certification, and this is why he refused to certificate the gyrocopter assembled by plaintiff. For a gyrocopter to qualify for airworthiness certification as an amateur-built aircraft under regulations of the FAA, the agent said a major portion or at least 51 percent of the components and parts used had to have been fabricated by the amateur builder from raw materials. If, the agent testified, plaintiff had fabricated 51 percent or more of the parts used in constructing the gyrocopter from the unfinished or raw materials kit purchased from defendant, and completed the craft with components secured from the prefinished gyrocopter kit, the gyrocopter could have been certified. This witness further stated the brochure statement, and similar phrases contained in the pamphlet, that "Factory Finished Kits will get you in the air quicker," were false as relating to gyrocopters, because such aircraft assembled totally from prefinished factory kits could not be certificated for legal flight. There was evidence that defend-

ant's agents were aware that FAA regulations "require a person to construct 51 percent of his [gyrocopter] craft [from raw materials or unfinished kits] in order to have it certified."

Plaintiff at no time undertook to rescind the sale and return the items purchased. At trial, plaintiff had in his possession "the two-place gyroglider and the B–8M gyrocopter with a 90-horsepower McCullough engine," both of which "are constructed in full and flyable. The remainder [the raw materials kit] is still crated." Plaintiff testified the raw materials kit had a value of $795, but the fully constructed and flyable gyrocopter "has absolutely no market value" because it could not be certified. No complaints whatever were made about the gyroglider and no evidence was adduced as to its value. While the gyroglider was bound to have some value, its worth was completely ignored by the parties, the jury and the trial court in an effort to ascertain plaintiff's legal damages, if any.

■ The constitutive elements of actionable fraud are (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intention it should be acted on by the person and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) the right to rely thereon, and (9) the hearer's consequent and proximate injury. Universal C.I.T. Credit Corporation v. Tatro, Mo.App., 416 S.W.2d 696, 702(1); Williams v. Miller Pontiac Company, Mo.App., 409 S.W.2d 275, 278(3); Bayer v. American Mutual Casualty Co., Mo., 359 S.W.2d 748, 752(2); Powers v. Shore, Mo., 248 S.W.2d 1, 5(2); 37 C.J.S. Fraud § 3, pp. 215–218. The establishment of each of these elements is necessary for recovery, and failure to establish any one element is fatal to the plaintiff. Salmon v. Brookshire, Mo.App., 301 S.W.2d 48, 54(5); Lowther v. Hays, Mo., 225 S.W.2d 708, 713; Orlann v. Lae-

derich, 338 Mo. 783, 92 S.W.2d 190, 194(7); Dillon v. Hill, Mo., 178 S.W. 85, 86(1).

*Was there an actionable false representation?* We think not.

Plaintiff contends the representations contained in defendant's literature sent in exchange for the coupon are the ones on which he relied, and the directions in the manuals subsequently received indicating use of the raw materials kit would not dilute the representations relied upon, as the manuals were not received until after he had placed his order and spent his money. There is no evidence or claim on plaintiff's behalf the representations were untrue regarding gyrogliders or insofar as claiming a gyrocopter assembled from a prefinished kit could actually and physically "get you in the air quicker," for plaintiff himself testified the gyrocopter thus assembled was "constructed in full and flyable." Neither is it asserted that defendant ever directly made the representation its prefinished gyrocopter kit when assembled would qualify for airworthiness certification by the FAA. Rather, it is plaintiff's theory that such statements as "Factory Finished Kits will get you in the air quicker," et cetera, are false because they must be interpreted as or interpolated into a representation that gyrocopters constructed from prefinished kits would qualify for airworthiness certification and comply with all of the rules and regulations of FAA.

■ Rules and regulations promulgated by government agencies pursuant to delegation of authority from Congress have the force and effect of law. DePass v. B. Harris Wool Co., 346 Mo. 1038 (banc), 144 S.W.2d 146, 147(2); Farmer v. Philadelphia Electric Company, 3rd Cir., 329 F.2d 3, 7(3), affirming, D.C., 215 F.Supp. 729; Mississippi Valley Barge Line Company v. United States, D.C.Mo., 252 F.Supp. 162, 166(2); 5 U.S.C.A. § 551 et seq.; 44 U.S.C.A. § 301 et seq.; 49 U.S.C.A. § 1301 et seq. (§ 1423). Missouri courts will judicially notice the rules and regulations

adopted by such agencies (Hough v. Rapid-air, Inc., Mo., 298 S.W.2d 378, 383(4); V. A.M.S. § 490.080), and any doubt as to the right to judicially notice the rules in this case was dispelled when plaintiff introduced evidence regarding them. Cf. Linam v. Murphy, 360 Mo. 1140, 232 S.W.2d 937, 943(16).

 Viewing the evidence in the light most favorable to plaintiff and accepting (although not deciding we must) plaintiff's theory that defendant's statements are to be interpreted as a representation that gyrocopters constructed of prefinished kits could be legally flown in compliance with all the rules and regulations of FAA, we conclude such a "representation would have been no more than the mere expression of a legal opinion. A statement of what the law will or will not allow to be done is a matter of opinion, albeit on a legal matter." Emily v. Bayne, Mo.App., 371 S.W. 2d 663, 668(6). As generally elsewhere, it is the law in Missouri that fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law. This is predicated upon the rule that everyone is presumed to know the law and is bound to take notice of the law and therefore, in legal contemplation, cannot be deceived by representations concerning the law or permitted to say he has been misled. Dettler v. Santa Cruz, Mo.App., 403 S.W.2d 651, 655(2 & 3); Emily v. Bayne, supra, 371 S.W.2d at 668(8); Thompson v. Kansas City, C. C. & St. J. Ry. Co., 224 Mo.App. 415, 27 S.W.2d 58, 60(1); Gilmore v. Ozark Mut. Ass'n, Mo.App., 21 S. W.2d 633, 634(3); Allgood v. Tarkio Electric & Water Co., 222 Mo.App. 964, 6 S. W.2d 51, 55(4); 37 Am.Jur.2d, Fraud and Deceit, § 73, pp. 113–116; 37 C.J.S. Fraud § 55, pp. 323–329. There are two well-recognized exceptions to this rule: (1) where there is a relationship of trust and confidence between the parties, and (2) where one party is possessed or claims to be possessed of superior knowledge of the law and takes advantage of the other party's ignorance of the law to mislead him.

See cases and authorities last cited, supra. Neither exception applies here, for the parties were dealing at arm's length sans a relationship of trust and confidence between them, and there was no evidence defendant had knowledge of the law superior to the knowledge plaintiff is presumed to possess.

The representations upon which plaintiff relied were representations regarding domestic law. Therefore, there was no evidence that defendant had practiced any actionable fraud or deceit upon the plaintiff, and defendant's motion for a directed verdict at the close of the evidence should have been sustained. The judgment against defendant is reversed.

HOGAN, P. J., and STONE, J., concur.